# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANAYA WASHINGTON, MICHELLE SOLAS, DINA VOLPE, MARC YANCEY, *and* DOUGLAS ANGONA, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> REYNOLDS CONSUMER PRODUCTS LLC, <br><br> Defendant. | Case No. 1:24-cv-02327-ALC-RFT <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs Michelle Solas, Dina Volpe, Marc Yancey, and Douglas Angona (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class," as defined below), bring this Second Amended Class Action Complaint against Defendant Reynolds Consumer Products LLC ("Defendant") and allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge, as follows:

## FACTUAL ALLEGATIONS

1.      Defendant manufactures, labels, markets, and sells aluminum foil under the "Reynolds Wrap" brand which it labels with the words "FOIL MADE IN U.S.A." (the "Product" or "Products"). An exemplar of the Product labeling is below:





2.      American consumers value buying products which are made in America.

3.      The Federal Trade Commission ("FTC") defines "Made in the United States," and its synonyms, such as "Made in U.S.A.," to mean any unqualified representation, express or

implied, that a product, and by extension, the raw materials used in its manufacture, are of U.S. origin. 16 C.F.R. §§ 323.1(a), 323.2.

4. Companies that use unqualified claims that products are "Made in U.S.A." can mislead consumers when raw materials used in those products are sourced and/or transformed outside of the United States.

5. The FTC considers it a deceptive practice to label a product as "Made in the United States" unless (1) the final assembly or processing of the product occurs in the United States, (2) all significant processing that goes into the product occurs in the United States, and (3) all or virtually all ingredients or components of the product are made and sourced in the United States. 16 C.F.R. § 323.2.

6. Due to Defendant's representation "FOIL MADE IN U.S.A.," consumers will expect that all or virtually all of the raw materials used in the foil Product are sourced from within the United States, and a substantial amount of the transformation of the Product's raw materials into the Product took place within the United States.

7. The three stars reinforce the "Made in U.S.A." claim because stars are uniquely associated with the United States, seen through its flag.

8. The raw material for the aluminum in aluminum foil is bauxite, the only commercial ore of aluminum.

9. The largest suppliers of bauxite for aluminum include Australia, Guinea, India, Brazil, and Jamaica.

10. Until World War II, the U.S. and France were the world's major suppliers of bauxite, as well as the world's major producers of aluminum.

11. Since 1981, none of the bauxite mined in the U.S. was used for aluminum.

12.     In 2013, the U.S. mined 1.3 percent of the bauxite it used, less than 0.1 percent of world production.

13.     U.S.-mined bauxite is used for abrasives, high-temperature refractory materials, and as a high-strength proppant for hydraulic fracturing of oil and gas wells.

14.     Without bauxite sourced from outside the United States, it would be impossible to produce the foil Product. All, or virtually all, of the bauxite used in the Products is sourced from outside of the United States, contrary to the "Made in U.S.A." claim.

15.     In the process of making aluminum foil, bauxite is processed and refined into alumina, and alumina is then turned through a smelting process into aluminum in the form of aluminum ingots. The aluminum ingots are then further processed to make aluminum foil. *See Aluminium*, GEOSCIENCE AUSTRALIA, AUSTRALIAN GOVERNMENT (2021), https://www.ga.gov.au/education/classroom-resources/minerals-energy/australian-mineral-facts/aluminium [https://perma.cc/HR5J-66FP].

16.     The aluminum in the Product is not a "raw material" of the Product because it originates as bauxite and must be transformed from bauxite into alumina and then transformed from alumina into aluminum before it can be further processed into aluminum foil. The transformation of bauxite to alumina is a multi-step, complicated process, as is the transformation of alumina into aluminum. *Id.* (under the heading "Processing"). According to Geoscience Australia, an agency of the Australian Government:

> i.     In almost all commercial operations, alumina is extracted from bauxite by the Bayer refining process. The process, discovered by Karl Josef Bayer in 1888, consists of four stages.
>
> a.     **Digestion**: the finely ground bauxite is fed into a steam-heated unit

4

called a digester. Here it is mixed, under pressure, with a hot solution of caustic soda. The aluminum oxide of the bauxite (and the reactive silica) reacts with the caustic soda forming a solution of sodium aluminate or green liquor and a precipitate of sodium aluminum silicate.

b.    **Clarification**: the green liquor or alumina-bearing solution is separated from the waste the undissolved iron oxides and silica which were part of the original bauxite and now make up the sand and red mud waste. This stage involves three steps: firstly, the coarse sand-sized waste is removed and washed to recover caustic soda; secondly, the red mud is separated out; and, finally the remaining green liquor is pumped through filters to remove any residual impurities. The sand and mud are pumped together to residue lakes and the green liquor is pumped to heat exchangers where it is cooled from $1000°C$ to around $650-790°C$.

c.    **Precipitation**: the alumina is precipitated from the liquor as crystals of alumina hydrate. To do this, the green liquor solution is mixed in tall precipitator vessels with small amounts of fine crystalline alumina, which stimulates the precipitation of solid alumina hydrate as the solution cools. When completed the solid alumina hydrate is passed on to the next stage and the remaining liquor, which contains caustic soda and some alumina, goes back to the digesters.

d.    **Calcination**: the alumina hydrate is washed to remove any

5

remaining liquor and then dried. Finally, it is heated to about 1000°C to drive off the water of crystallization, leaving the alumina—a dry, pure white, sandy material. A portion of the alumina may be left in the hydrate form or further processed for the chemical industry.

ii.  Alumina is turned into aluminum through a smelting process. All commercial production of aluminum is based on the Hall-Héroult smelting process in which the aluminum and oxygen in the alumina are separated by electrolysis. Electrolysis involves passing an electric current through a molten solution of alumina and natural or synthetic cryolite (sodium aluminum fluoride). The molten solution is contained in reduction cells or pots which are lined at the bottom with carbon (the cathode) and are connected in an electrical series called a potline. Inserted into the top of each pot are carbon anodes, the bottoms of which are immersed in the molten solution.

   a.  The passage of an electric current causes the oxygen from the alumina to combine with the carbon of the anode forming carbon dioxide gas. The remaining molten metallic aluminum collects at the cathode on the bottom of the pot. Periodically, it is siphoned off and transferred to large holding furnaces. Impurities are removed, alloying elements added and the molten aluminum is cast into ingots.

   b.  The smelting process is a continuous one. As the alumina content of the cryolite bath is reduced more is added. Heat generated by the

6

passage of the electric current maintains the cryolite bath in its molten state so that it will dissolve the alumina. A great amount of energy is consumed during the smelting process; from 14,000 - 16,000 kilowatt hours of electrical energy is needed to produce one tonne of aluminum from about two tonnes of alumina. Aluminum is sometimes referred to as 'solid electricity' owing to the large amount of power used in its production. The availability of cheap electricity is therefore essential for economic production.

iii.    Aluminum ingots are produced in various shapes and sizes depending on their end use. They may be rolled into plate, sheet, foil, bars or rods. They may be drawn into wire which is stranded into cable for electrical transmission lines. Presses extrude the ingots into hundreds of different useful and decorative forms or fabricating plants may convert them into large structural shapes.

17.    A substantial amount of the bauxite that is used to make (ultimately) the aluminum that is used in the Product is transformed into alumina outside of the United States. *See Top Alumina Refineries in the World*, AL CIRCLE BIZ (Sept. 27, 2021), https://www.alcirclebiz.com/blog-top-alumina-refineries-in-the-world [https://perma.cc/545V-4QPD]; *Top five alumina refineries in the world by capacity*, AL CIRCLE (Beethika Biswas ed. Dec. 15, 2018), https://www.alcircle.com/news/top-five-alumina-refineries-in-the-world-by-capacity-39754 [https://perma.cc/B2SJ-Z4QB] (alumina production in North America (including Canada) from the first quarter to the fourth quarter in 2018 accounted for only around 2.2% of world alumina production). A document by Alcoa, which is a major bauxite miner, alumina refiner,

and aluminum smelter, identifies the top 20 global bauxite mines excluding China in 2023 by Wood Mackenzie estimated annual production, as well as the top 20 global alumina refineries excluding China in 2023 by Wood Mackenzie estimated annual production; as shown below, none of these bauxite mines or alumina refineries are within the United States. *Alcoa announces agreement with Alumina Limited on terms and process to acquire Alumina Limited in an all-stock transaction* at 12, ALCOA (Feb. 25, 2024) https://s29.q4cdn.com/945634774/files/doc_presentations/2024/Feb/25/alcoa-investor-presentation-20240225_final.pdf [https://perma.cc/JXW2-2KFW]; *see also id.* at 9, 11, 20.

**Top 20 global bauxite mines ex China (2023), as listed in Alcoa document**
1. SMB-WAP – Guinea
2. Weipa / Amrun – Australia
3. Huntly – Australia
4. CBG – Guinea
5. Boddington – Australia
6. Boffa – Guinea
7. Sangaredi – Guinea
8. Trombetas – Brazil
9. Gove – Australia
10. Paragominas – Brazil
11. Willowdale – Australia
12. Panchpatmali – India
13. Baphlimali – India
14. Juruti – Brazil
15. Indonesia Ketapang – Indonesia
16. Al Ba'itha – Saudi Arabia
17. Timan – Russia
18. Bauxite Hills (Project) – Australia
19. Discovery Bay – Jamaica
20. Kodingamali – India

**Top 20 global alumina refineries ex China (2023), as listed in Alcoa document**
1. Alunorte – Brazil
2. Worsley – Australia
3. Pinjarra – Australia
4. Alumar – Brazil
5. Gladstone (Qal) – Australia
6. Yarwun – Australia
7. Wagerup – Australia

8

8.  Al Taweelah – United Arab Emirates
9.  Utkal – India
10. Damanjodi – India
11. Ketapang – Indonesia
12. Ras Al-Khair – Saudi Arabia
13. Lanjigarh – India
14. Bintan Alumina – Indonesia
15. Vaudreuil – Canada
16. Aughinish – Ireland
17. Kwinana – Australia
18. Pavlodar – Kazakhstan
19. Jamalco – Jamaica
20. Bogoslovsk – Russia

18.     A substantial amount of the alumina that is used in the aluminum that is used in the Product is transformed into aluminum outside of the United States. *See Aluminum smelters of the World (outside of China)*, ASKJA ENERGY PARTNERS (Sept. 29, 2020), https://askjaenergy.com/2020/09/29/aluminum-smelters-of-the-world-outside-of-china/ [https://perma.cc/N6DZ-MJ5M]; *From ore to ingots: Meet the top 5 aluminium smelters in the world*, AL CIRCLE BIZ (Jan. 12, 2024), https://www.alcirclebiz.com/blog-from-ore-to-ingots-meet-the-top-5-aluminium-smelters-in-the-world [https://perma.cc/A98C-YQJ4].

19.     Because a substantial amount of the bauxite that is used (ultimately) in the aluminum in the Products, as well as a substantial amount of the alumina that is used in the aluminum in the Products, are transformed into aluminum outside of the United States, a substantial amount of the making, manufacturing, and/or production of the aluminum foil Products takes place outside of the United States, contrary to the "Made in U.S.A." claim.

20.     Defendant attempts to qualify the "Made in U.S.A." claim by purporting to limit its applicability to the "FOIL," that the "*FOIL* [is] MADE IN U.S.A."

21.     This is insufficient to qualify the "Made in U.S.A." claim because consumers are not familiar with the sources of bauxite, the locations where bauxite is transformed into alumina,

9

or the locations where alumina is transformed into aluminum.

22. Reasonable consumers do not understand Defendant's claim to refer only to the processing of aluminum ingots into aluminum foil.

23. Assuming (without conceding) that Defendant processes aluminum ingots into aluminum foil only in the United States, using only American workers, the claim is not qualified to state only this.

24. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

25. Consumers frequently rely on representations, imagery, colors, and information on the labeling of products such as aluminum foil—especially the front labeling—in making purchase decisions.

26. Reasonable consumers read and relied on Defendant's "Made in U.S.A." representations when purchasing the Products, as they were on the front labeling of the Product.

27. At the time Plaintiffs and reasonable consumers purchased the Products, they did not know, and had no reason to know, that the Products' "Made in U.S.A." representations on the label were false, misleading, deceptive, and unlawful as set forth herein.

28. Defendant's "Made in U.S.A." representations were material to Plaintiffs' and the Class members' decisions to purchase the Products.

29. Defendant knew, or should have known, that the "Made in U.S.A." representations were false, misleading, deceptive, and unlawful, at the time that it advertised the Products and intentionally and deliberately placed the "Made in U.S.A." representations on the Products' labeling and packaging.

30.    Plaintiffs and the Class members paid a price premium for Defendant's aluminum foil Products based on the "Made in U.S.A." representations.

31.    The value of the Products that Plaintiffs purchased was materially less than their value as represented by Defendant by means of the "Made in U.S.A." representations.

32.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

33.    Had Plaintiffs and the Class members known the truth, they would not have bought the Product or would have paid less for it.

34.    As a result of the false and misleading representations, the Product is sold for a price premium, approximately no less than $4.99 per 75 square feet, excluding tax or any sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions that the Product is "Foil Made in U.S.A."

**PARTIES**

**Plaintiff Michelle Solas**

35.    Plaintiff Michelle Solas resides in the Bronx, New York.

36.    Plaintiff Solas purchased Products including Reynolds Heavy Duty aluminum foil 130 square feet in New York during the statutory period. Plaintiff Solas purchased the Products at locations including online at Amazon Fresh and Target, and in the store in ShopRite on Bruckner Boulevard in the Bronx.

37.    Plaintiff Solas believed the Product was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.

11

38.	Plaintiff Solas bought the Product because she expected it was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country, because that is what the representations said and implied.

39.	Plaintiff Solas relied on the words, layout, packaging, and images on the Product label in deciding to purchase the Product, including the "Foil Made in U.S.A." representation.

40.	Plaintiff Solas is one of the many Americans who seeks to buy American.

41.	Plaintiff Solas trusted the Reynolds Wrap brand, because it is the equivalent of Kleenex (facial tissues) and Vaseline (petroleum jelly) in terms of its identity and position in its product category.

42.	Plaintiff Solas did not expect a product, especially from the Reynolds brand, would promise it was "Foil Made in U.S.A." even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

43.	The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

44.	Plaintiff Solas would not have purchased the Product if she knew the "Made in U.S.A." representations and omissions were false and misleading, or she would have paid less for it.

45.	The Product was worth less than what Plaintiff Solas paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

12

**Plaintiff Dina Volpe**

46.     Plaintiff Dina Volpe resides in Buffalo, New York.

47.     Plaintiff Volpe purchased Products including Reynolds Everyday Foil 250 square feet 2-pack in New York during the statutory period. Plaintiff purchased the Products at stores including Target and/or Walmart.

48.     Plaintiff Volpe believed the Product was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.

49.     Plaintiff Volpe bought the Product because she expected it was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country, because that is what the representations said and implied.

50.     Plaintiff Volpe relied on the words, layout, packaging, and images on the Product label in deciding to purchase the Product, including the "Foil Made in U.S.A." representation.

51.     Plaintiff Volpe is one of the many Americans who seeks to buy American.

52.     Plaintiff Volpe trusted the Reynolds Wrap brand, because it is the equivalent of Kleenex (facial tissues) and Vaseline (petroleum jelly) in terms of its identity and position in its product category.

53.     Plaintiff Volpe did not expect a product, especially from the Reynolds brand, would promise it was "Foil Made in U.S.A." even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

54.     The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of

the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

55. Plaintiff Volpe would not have purchased the Product if she knew the "Made in U.S.A." representations and omissions were false and misleading, or she would have paid less for it.

56. The Product was worth less than what Plaintiff Volpe paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

**Plaintiff Marc Yancey**

57. Plaintiff Marc Yancey resides in Utica, New York.

58. Plaintiff Yancey purchased the Products in New York within the past two years at stores including Target and/or Walmart.

59. Plaintiff Yancey believed the Product was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.

60. Plaintiff Yancey bought the Product because he expected it was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country, because that is what the representations said and implied.

61. Plaintiff Yancey relied on the words, layout, packaging, and images on the Product label in deciding to purchase the Product, including the "Foil Made in U.S.A." representation.

62. Plaintiff Yancey is one of the many Americans who seeks to buy American.

63. Plaintiff Yancey trusted the Reynolds Wrap brand, because it is the equivalent of

14

Kleenex (facial tissues) and Vaseline (petroleum jelly) in terms of its identity and position in its product category.

64.    Plaintiff Yancey did not expect a product, especially from the Reynolds brand, would promise it was "Foil Made in U.S.A." even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

65.    The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

66.    Plaintiff Yancey would not have purchased the Product if he knew the "Made in U.S.A." representations and omissions were false and misleading, or he would have paid less for it.

67.    The Product was worth less than what Plaintiff Yancey paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

**Plaintiff Douglas Angona**

68.    Plaintiff Douglas Angona resides in Hudson, New York.

69.    Plaintiff Angona purchased the Products in New York during the statutory period at stores including Lowe's, Walmart, and/or ShopRite.

70.    Plaintiff Angona believed the Product was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country.

71. Plaintiff Angona bought the Product because he expected it was "Made in U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials were sourced within this country, because that is what the representations said and implied.

72. Plaintiff Angona relied on the words, layout, packaging, and images on the Product label in deciding to purchase the Product, including the "Foil Made in U.S.A." representation.

73. Plaintiff Angona is one of the many Americans who seeks to buy American.

74. Plaintiff Angona trusted the Reynolds Wrap brand, because it is the equivalent of Kleenex (facial tissues) and Vaseline (petroleum jelly) in terms of its identity and position in its product category.

75. Plaintiff Angona did not expect a product, especially from the Reynolds brand, would promise it was "Foil Made in U.S.A." even though all or virtually all of the raw materials used were from outside of the United States and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

76. The "Made in U.S.A." claim was deceptive because in fact, all or virtually all of the raw materials used in the Product were from outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product took place outside of the United States.

77. Plaintiff Angona would not have purchased the Product if he knew the "Made in U.S.A." representations and omissions were false and misleading, or he would have paid less for it.

78. The Product was worth less than what Plaintiff Angona paid, and he would not have

paid as much absent Defendant's false and misleading statements and omissions.

**Defendant Reynolds Consumer Products LLC**

79.    Defendant Reynolds Consumer Products LLC is a Delaware limited liability company with its principal place of business in Lake Forest, Illinois, which is in Lake County, Illinois.

80.    Defendant is one of the oldest producers of aluminum products in the world.

81.    Defendant was instrumental in helping the United States achieve victory in the Second World War, through its commitment to converting bauxite into military equipment, used to defeat the Axis powers.

82.    For these, and other reasons, Defendant's packaging truthfully states that "Reynolds Wrap [is] TRUSTED SINCE 1947."

83.    Defendant's aluminum foil is a staple of Americana, with a variety of uses beyond wrapping up food.

84.    The Product is available to consumers in this District from third parties which include grocery stores, warehouse club stores, drug stores, convenience stores, big box stores, and online retailers.

**JURISDICTION AND VENUE**

85.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

86.    The aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

87.    Plaintiffs are citizens of New York.

88.    Defendant is a Delaware limited liability company with its principal place of

business in Illinois.

89.    Upon information and belief, at least one member of Defendant is not a citizen of the same state as Plaintiffs or the Class of persons Plaintiffs seek to represent.

90.    The members of the Class Plaintiffs seek to represent are more than 100, because the Product has been sold for several years with the "FOIL MADE IN U.S.A." representations at issue in numerous grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online retailers across the State.

91.    Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in Bronx County, including Plaintiff Solas's purchase of the Product and awareness and experiences of and with the issues described here.

92.    This Court has personal jurisdiction over Defendant because it transacts business within New York and sells aluminum foil labeled "FOIL MADE IN U.S.A." to consumers within New York, including the Product sold to Plaintiff Solas.

## CLASS ALLEGATIONS

93.    Plaintiffs seek certification under Federal Rule of Civil Procedure 23(a) and (b)(3) of the following class:

> **The Class.** All persons who purchased the Product in New York from March 27, 2021, to the present.

94.    Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and Court staff; and (d) any person that timely and properly excludes himself or herself from the Class.

95.    Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation or analysis reveal the Class should be expanded, narrowed, or otherwise

18

revised.

96.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims.

97.     **Numerosity.** The size of the Class is so large that joinder of all Class members is impracticable. Due to the nature of Defendant's business, Plaintiffs believe there are at least thousands, if not hundreds of thousands, of Class members geographically dispersed throughout New York.

98.     **Commonality and Predominance.** There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual Class members. Common legal and factual questions include but are not limited to:

> i.      whether Defendant engaged in the course of conduct alleged herein;
>
> ii.     whether Defendant labeled the Product as "FOIL MADE IN U.S.A." followed by three stars or "FOIL MADE IN U.S.A.";
>
> iii.    whether all or virtually all of the bauxite used in the Products is sourced from outside of the United States;
>
> iv.     whether a substantial amount of the making, manufacturing, and/or production of the Product took place outside of the United States;
>
> v.      whether Defendant's representation that the Products were "FOIL MADE IN U.S.A.," is likely to deceive a reasonable consumer;
>
> vi.     whether Defendant's representation that the Products were "FOIL MADE IN U.S.A.," is material to a reasonable consumer;
>
> vii.    whether Defendant's representations and/or omissions violate the consumer protection statutes invoked below;
>
> viii.   whether Plaintiffs and the Class members have suffered injury in fact and lost money as a result of Defendant's acts, omissions, or misrepresentations

19

of material facts; and

ix.    whether Plaintiffs and the Class members are entitled to actual damages, statutory damages, and/or other monetary relief including restitution or disgorgement.

99.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class members. Similar or identical statutory violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

100.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class members because Defendant injured all Class members through the uniform misconduct described herein; all Class members were subject to Defendant's false, misleading, and unfair advertising and marketing practices and representations, including the false and misleading claims that the Products are "FOIL MADE IN U.S.A."; and Plaintiffs seek the same relief as the Class members.

101.    Furthermore, there are no defenses available to Defendant that are unique to Plaintiffs.

102.    **Adequacy of Representation.** Each Plaintiff is a fair and adequate representative of the Class because each Plaintiff's interests do not conflict with the Class members' interests. Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendant. Furthermore, Plaintiffs have selected competent counsel that are experienced in class action and other complex litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

103.    **Superiority.** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the

20

following:

    i.    The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.

    ii.    Further, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

104.    **Notice.** Plaintiffs and their counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

<u>**CLAIMS FOR RELIEF**</u>

<u>**FIRST CLAIM**</u>

**Violation of New York General Business Law Section 349**

**By Plaintiffs against Defendant on Behalf of the Class**

105.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

106.    Plaintiffs bring this claim on behalf of the Class for violation of New York General Business Law section 349.

107.    Under section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York] are . . . declared unlawful." N.Y. GEN. BUS. LAW § 349(a).

108.    As alleged above, by advertising, marketing, distributing, and/or selling the Products with claims that they are "FOIL MADE IN U.S.A." to Plaintiffs and the members of the Class, Defendant has engaged in deceptive acts and practices. Defendant's conduct is deceptive because Defendant has made materially false and misleading express and implied representations and omissions that cause reasonable consumers to believe the Product is "FOIL MADE IN U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials (including bauxite) were sourced within this country.

109.    As detailed above, in fact, the Products are not "Made in U.S.A." because all or virtually all of the bauxite used to make the Products is obtained outside of the United States, and a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product takes place outside of the United States, including a substantial amount of the transformation of bauxite into alumina and a substantial amount of the transformation of alumina into aluminum.

110.    Plaintiffs and the Class members would not have purchased the Products at a premium price had they known the Products were not actually "MADE IN U.S.A."

111.    Plaintiffs and the Class members were injured in fact and lost money as a result of Defendant's conduct of describing the Products as "FOIL MADE IN U.S.A." Plaintiffs and the Class members paid for Products that were "FOIL MADE IN U.S.A." but did not receive such Products. The Products Plaintiffs and the Class members received were worth less than the Products for which they paid. Plaintiffs and the Class members paid a premium price on account of Defendant's misrepresentations that the Products were ""FOIL MADE IN U.S.A."

112.    By reason of the foregoing, Defendant's actions, as alleged herein, constitute deceptive acts and practices in violation of section 349, and Plaintiffs and the Class members seek

22

to recover their actual damages or $50, whichever is greater. N.Y. GEN. BUS. LAW § 349(h).

113. Plaintiffs and the Class members further seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, attorneys' fees and costs, and any other relief allowable under New York General Business Law section 349.

## SECOND CLAIM

### Violation of New York General Business Law Section 350

### By Plaintiffs against Defendant on Behalf of the Class

114. Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate such allegations by reference herein.

115. Plaintiffs bring this claim on behalf of the Class for violation of New York General Business Law section 350.

116. Under section 350, "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York] is . . . declared unlawful." N.Y. GEN. BUS. LAW § 350.

117. As alleged above, by advertising, marketing, distributing, and/or selling the Products with claims that they are "FOIL MADE IN U.S.A." to Plaintiffs and the members of the Class, Defendant has engaged in false advertising. Defendant's conduct is deceptive because Defendant has made materially false and misleading express and implied representations and omissions that cause reasonable consumers to believe the Product is "FOIL MADE IN U.S.A.," understood to mean the raw materials for the Product were converted and transformed in the U.S.A., and the raw materials (including bauxite) were sourced within this country.

118. As detailed above, in fact, the Products are not "MADE IN U.S.A." because all or virtually all of the bauxite used to make the Products is obtained outside of the United States, and

23

a substantial amount of the making, manufacturing, and/or production of the aluminum foil Product takes place outside of the United States, including a substantial amount of the transformation of bauxite into alumina and a substantial amount of the transformation of alumina into aluminum.

119.   Plaintiffs and the Class members would not have purchased the Products at a premium price had they known the Products were not actually "MADE IN U.S.A."

120.   Plaintiffs and the Class members were injured in fact and lost money as a result of Defendant's conduct of describing the Products as "FOIL MADE IN U.S.A." Plaintiffs and the Class members paid for Products that were "FOIL MADE IN U.S.A." but did not receive such Products. The Products Plaintiffs and the Class members received were worth less than the Products for which they paid. Plaintiffs and the Class members paid a premium price on account of Defendant's misrepresentations that the Products were "FOIL MADE IN U.S.A."

121.   By reason of the foregoing, Defendant's actions, as alleged herein, constitute false advertising in violation of section 350, and Plaintiffs and the Class members seek to recover their actual damages or $500, whichever is greater. N.Y. GEN. BUS. LAW § 350-e(3).

122.   Plaintiffs and the Class members further seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, attorneys' fees and costs, and any other relief allowable under New York General Business Law section 350.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request the Court to enter an Order:

A.   certifying the proposed Class under Federal Rule of Civil Procedure 23(a) and (b)(3), as set forth above;

B.      declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.      declaring that Defendant has committed the violations of law alleged herein;

D.      awarding monetary damages, including but not limited to any statutory, actual, compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

E.      providing for any and all equitable monetary relief the Court deems appropriate;

F.      awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

G.      awarding pre- and post-judgment interest to the extent the law allows; and

H.      providing such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable.

Date: April 18, 2025                          Respectfully submitted,

**REESE LLP**

By:  */s/ George V. Granade*
George V. Granade
*ggranade@reesellp.com*
8484 Wilshire Boulevard, Suite 515
Los Angeles, California 90211
Telephone: (310) 393-0070

**REESE LLP**
Michael R. Reese
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025

25

Telephone: (212) 643-0500

**BAILEY & GLASSER, LLP**
Elizabeth Ryan (*pro hac vice* to be filed)
*eryan@baileyglasser.com*
176 Federal Street, 5th Floor
Boston, Massachusetts 02110
Telephone: (617) 439-6730

**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
*spencer@spencersheehan.com*
60 Cuttermill Road, Suite 412
Great Neck, New York 11021
Telephone: (516) 268-7080

*Counsel for Plaintiffs Michelle Solas, Dina Volpe, Marc Yancey, and Douglas Angona and the Proposed Class*